No. 123,061

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

WHEATLAND ELECTRIC COOPERATIVE, INC.,
*Appellant*,

v.

CITY OF GARDEN CITY, KANSAS,
*Appellee*.

SYLLABUS BY THE COURT

1.

The provisions of the Retail Electric Suppliers Act direct the Kansas Corporation Commission to regulate electricity suppliers that supply electricity in much of the state. The Retail Electric Suppliers Act directs the Commission to divide the state into electric service territories. The Kansas Corporation Commission then certifies one supplier for each service area and provides them with a certificate of convenience. That supplier then has the exclusive right to provide electricity in its assigned territory, and it may not extend its service into the territory of another supplier.

2.

Electricity suppliers may agree to different service territorial boundaries, but those agreements must be approved by the Kansas Corporation Commission.

3.

The Retail Electric Suppliers Act limits the jurisdiction of the Kansas Corporation Commission to areas outside the corporate boundaries of Kansas cities.

4.

When a city annexes land located within the service territory of an electricity supplier, that supplier's right to provide electric service to consumers within the annexed land ends.

5.

The Retail Electric Suppliers Act allows the electricity supplier, whose service rights were terminated because of municipal annexation, to receive fair and reasonable compensation for the loss of service rights from the electricity supplier who takes over service within the annexed land. If the former supplier and the city are unable to agree on compensation, either party may then petition a district court to determine the proper amount for compensation.

6.

Equitable considerations do not apply when a statutory scheme positively governs the law in a particular situation.

7.

The principle of statutory preeminence is well established in Kansas. Where a transaction or contract is declared void because it is not in compliance with express statutory or constitutional provisions, a court of equity cannot interpose to give validity to such a transaction or contract, or any part thereof.

Appeal from Finney District Court; ROBERT J. FREDERICK, judge. Opinion filed December 3, 2021. Reversed and remanded with directions.

*James M. McVay*, of Wheatland Electric Cooperative, Inc., and *Allen G. Glendenning*, of Watkins Calcara, Chtd., of Great Bend, for appellant.

*Timothy J. Sear*, *Frank Caro Jr.*, and *Andrew O. Schulte*, of Polsinelli PC, of Kansas City, Missouri, and *Randall D. Grisell*, of Doering, Grisell & Cunningham, P.A., of Garden City, for appellee.

Before BUSER, P.J., HILL and ISHERWOOD, JJ.

HILL, J.:  All Kansas public utilities are regulated by the State of Kansas. To further this regulatory policy, the Legislature enacted the Retail Electric Suppliers Act, K.S.A. 66-1,170 et seq. The Act directs the Kansas Corporation Commission to decide what entity is responsible for providing electricity to Kansas consumers located outside our cities.

In a case of first impression, this appeal presents us with three questions that arise from applying the Act. First, can an oral agreement between a city manager and the general manager of an electric cooperative allowing the city to provide electricity to a territory outside that city be enforceable, even though that agreement has not been approved by the Commission as required by the Act? Second, can the equitable doctrines of laches, estoppel, and waiver render such a contract valid, even though that contract is void according to the statutes? Third, may a supplier of electricity receive compensation under the Act after a city annexes part of that supplier's territory even if the supplier had not been serving customers in the area because of an informal agreement between the parties?

*How this appeal arose.*

When Garden City annexed some adjacent land where an ethanol plant was located, Wheatland Electric Cooperative, Inc., a public utility that supplies electricity in central and western Kansas and eastern Colorado, claimed it had exclusive rights to provide electricity in that territory and sued the City for compensation, citing the Act as authority. The district court granted summary judgment to the City on three grounds.

3

- Wheatland had transferred its service rights to the City years earlier by oral agreement.
- The equitable doctrines of laches, estoppel, and waiver bar Wheatland from repudiating its agreement with the City.
- Because Wheatland had not provided electricity to any consumers in the annexed territory before it was annexed, it has no right to compensation under the Act after the territory was annexed.

Wheatland brings this appeal.

*The record reflects a history of cooperation between the parties and a handshake agreement.*

Under the Act, the Commission regulates the supply of electricity by public utilities to customers located outside the corporate boundaries of cities. The Commission has divided all of the state into territories, and each territory generally has just one electricity supplier serving all consumers within it. The Commission assigned to Wheatland the service area surrounding Garden City in 1977. Wheatland maintained the exclusive rights to provide retail electric service in all of that area until at least 2004 or 2005. In fact, Wheatland generates and provides electricity to Garden City and Garden City, in turn, supplies electricity to consumers within the city limits.

Sometime in 2004 or 2005, Garden City's city manager met with Wheatland's general manager to discuss retail electric service at a site just outside the city limits. The site was within Wheatland's service area, but Garden City, the retail electric supplier within its own limits, wanted to supply electricity to the site at a subsidized rate as part of an incentive package to attract an ethanol plant. Because of certain financing conditions, the company building the ethanol plant did not want to be located in an area annexed by

4

Garden City. This is important because Garden City could have simply annexed the land at that time or at any time after that.

Wheatland's general manager agreed to let Garden City supply electricity to the ethanol plant. The general manager and the city manager did not discuss the arrangement again, and there was never a written agreement. Neither Garden City's City Commission nor Wheatland's Board of Trustees formally authorized or ratified this agreement. And neither party submitted the agreement to the Commission for its approval.

Under the agreement, Garden City, in 2007, began supplying electricity to the ethanol plant and an office building containing the plant's offices. Then in 2012, the City began supplying electricity to two more businesses in the same area. The City spent around $800,000 to construct the infrastructure necessary to supply electricity to the four customers. Wheatland either supported or did not object to Garden City supplying electricity to these other customers. Wheatland, in fact, earned about $1.9 million from 2007 to 2013 by selling electricity to the City that the City then sold to the ethanol plant.

Few relationships last forever. A new general manager took over at Wheatland in 2012. In 2015, the new manager wrote to the City, saying that Wheatland wanted to begin supplying electricity to the ethanol plant and asking the City to work with it on a transition plan. The City rejected that request, stating that it had a contractual relationship with Wheatland and that it intended to keep supplying the plant with electricity. Wheatland informed the City that it no longer agreed to any arrangement with the City and that it was Wheatland's right and obligation to supply electricity to the plant. Wheatland's manager wrote in terms of acquiescence:

> "If it is true that Wheatland acquiesced to the City serving [the ethanol plant], it certainly is no longer the case. . . . We recently determined that [the ethanol plant] is still within

5

Wheatland's certified service territory. Therefore, Wheatland has a right and obligation to serve this load.

"Therefore, Wheatland puts the city on notice that it no longer will agree, if it ever formally did, that the City would be allowed to serve [the ethanol plant]."

Two years later, in 2017, Wheatland filed a complaint against Garden City with the Commission. The complaint asked the Commission to order Garden City to stop supplying electricity to the plant. In a reply to the Commission's certified questions, Wheatland described several scenarios under which it could begin supplying electricity to the plant. Those included paying local access charges to Garden City to use its infrastructure or purchasing a substation from Garden City, which would allow immediate service, and installing a mobile substation, which would take six to eight weeks to build.

Garden City argued to the Commission that Wheatland had ceded the territory based on the oral agreement and asked the Commission to ratify the agreement by transferring service rights for the area from Wheatland to the City. But employing a different strategy, Garden City then annexed the three parcels of land that contained the ethanol plant and the other customers it had been serving. After that, Garden City moved to dismiss Wheatland's complaint, saying there was no longer a case or controversy because the Commission lacked jurisdiction over electric service within city limits. Wheatland acknowledged that the annexation had rendered its petition moot. Garden City designated itself the new electric supplier for the customers in the annexed territory.

In the end, the Commission dismissed Wheatland's complaint and chided the parties. The Commission found that "Garden City, by providing retail electric service outside of its city boundaries without Commission authority, and Wheatland, by acquiescing to and allowing such unauthorized service by Garden City, both violated K.S.A. 66-1,173." The Commission also noted that it could rightfully assess civil

6

penalties under K.S.A. 66-138 for the failure to follow the Act's requirements, but it ultimately refrained from doing so. In conclusion, the Commission held that it was "troubled by the resources that have been consumed, some at ratepayer expense, in the Commission's adjudication of a Complaint that should have been avoided by the parties' adherence to the law."

After the Commission dismissed the complaint, Wheatland sued Garden City in Finney County District Court seeking compensation under K.S.A. 2017 Supp. 66-1,176. That statute requires "fair and reasonable" compensation to be paid to an electric supplier that has part of its service area annexed. If the parties cannot agree on what compensation is "fair and reasonable," then the statute permits the supplier to receive "an amount equal to two times the gross revenues attributable to the customers in the terminated territory" over the next year. K.S.A. 2017 Supp. 66-1,176(c)(3). Wheatland sought more than $7 million based on that provision. That amount reflects two times the gross revenues attributable to the four customers in the area Garden City annexed. Nearly all that revenue is attributable to the ethanol plant's electricity usage.

Both Wheatland and Garden City submitted their cases to the district court through motions for summary judgment. Wheatland argued that any agreement it had with Garden City was void because the Act requires the Commission to approve any agreements that alter service areas, and the Commission had never done that. Because of that, Wheatland contended that it had retained the exclusive rights to supply electricity in the area that Garden City annexed, so it was entitled to compensation under K.S.A. 2017 Supp. 66-1,176. Garden City argued that it had a contractual right to serve the disputed territory, that the compensation statute did not apply because Wheatland had no customers in the territory, and that various equitable principles should prevent Wheatland from receiving compensation.

7

The court ruled on both motions for summary judgment. It denied Wheatland's motion, finding that Wheatland had ceded its right to serve the area based on an implied-in-fact contract with Garden City. It also held that the equitable doctrines of laches, estoppel, and waiver precluded Wheatland from repudiating that agreement. The court also found that the compensation statute presumes that a supplier is entitled to compensation for the loss of actual customers and since Garden City, not Wheatland, had served the customers in the annexed territory, Wheatland had no right to compensation under the law. The court granted summary judgment to Garden City.

To us, Wheatland makes two arguments. The court erred in granting summary judgment to Garden City on Wheatland's claim for compensation under K.S.A. 2017 Supp. 66-1,176, and the court erred by *not* granting Wheatland summary judgment on its claim for compensation under K.S.A. 2017 Supp. 66-1,176.

To resolve this appeal, we must first look at the Act itself. Its purposes, its breadth, and its specific provisions all come into play in answering the questions raised here. After examining the statute, we will review the procedural history of this case to determine whether it is properly before us. And then, we must review the summary judgment granted to Garden City by the district court as well as its denial of summary judgment to Wheatland.

As we work through these questions, we are mindful that summary judgment is appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. This court approaches the issue just as the district court would, so we need not defer to that court's conclusions. See *GFTLenexa, LLC v. City of Lenexa*, 310 Kan. 976, 981-82, 453 P.3d 304 (2019).

*We review the Act to give a context for our holding.*

The production and sale of electricity is regulated by the State. The provisions of the Act call for the Commission to regulate the rights of retail electric suppliers to supply electricity in much of the state. K.S.A. 66-1,172 directs the Commission to divide the state into electric service territories. The Commission then certifies one supplier for each service area and provides them with a certificate of convenience. That supplier then has the exclusive right to provide electricity in its territory, and it may not extend its service into the territory of another supplier. K.S.A. 66-1,172; K.S.A. 66-1,173. Although the Commission determined the initial service territories after the Act passed, suppliers may agree to different boundaries. But those agreements "shall be subject to approval by the corporation commission." K.S.A. 66-1,172; K.S.A. 66-1,175.

But the Act does not govern the supply of electricity in the entire state. It limits the jurisdiction of the Commission to areas outside the corporate boundaries of a city. See K.S.A. 66-1,174. Because cities can annex land and grow, city boundaries sometimes change. See K.S.A. 2020 Supp. 12-520. When a city annexes land within the service territory of an electric supplier, the supplier's right to provide service under the Act ends. K.S.A. 2017 Supp. 66-1,176(a). When that happens, K.S.A. 2017 Supp. 66-1,176(c) allows the supplier whose rights were terminated to receive "fair and reasonable" compensation from the supplier who takes over service. If the parties are unable to agree on compensation, either party may petition a district court to determine the proper amount. K.S.A. 2017 Supp. 66-1,176(d). That is what happened in this case.

*We hold that the doctrine of exhaustion of administrative remedies does not apply here.*

Wheatland claims that Garden City must have had the Commission rule on its claim that the City has a contract with Wheatland before it could raise the issue in district

9

court. In other words, Garden City had to have exhausted its administrative remedies before it could raise the issue in district court. We are not persuaded that doctrine applies.

Wheatland contends that Garden City is precluded from arguing that it had a contract with Wheatland to transfer the service territory because Wheatland failed to exhaust administrative remedies under the Kansas Judicial Review Act, K.S.A. 77-601 et seq. Under the Judicial Review Act, a party may petition a court for review of a final agency action only if the party has first exhausted all administrative remedies available within the agency. K.S.A. 77-612.

Wheatland's argument is misplaced. There is no agency action here for us to review. After all, the Commission dismissed Wheatland's complaint as being moot. Simply put, the Judicial Review Act does not apply here.

The statutory basis for Wheatland's petition is K.S.A. 2017 Supp. 66-1,176(d), which specifically provides that either party may petition the district court if compensation cannot be agreed upon after the annexation of a supplier's service territory. Garden City need not have the Commission rule on its defenses before raising them in district court.

We now turn to the first question. Did Wheatland transfer its rights to supply electricity to the four customers in the disputed area through an oral agreement and subsequent conduct?

*It is the Commission that controls who can provide electricity in a particular rural territory under the Act. Any agreement to alter any particular territory must be approved by the Commission. Thus, any agreement between Wheatland and Garden City did not comply with the law because they did not obtain Commission approval.*

A specific statute, K.S.A. 66-1,175, governs agreements between retail electric suppliers that alter service territories. Under that law, suppliers may enter into agreements to amend the boundaries between their territories, but such agreements "shall be subject to approval by the corporation commission":

> "**66-1,175. Agreements between retail electric suppliers authorized; commission approval required.** Notwithstanding the exclusive right of retail electric suppliers to provide service within the certified territories established pursuant to this act, a retail electric supplier may enter into an agreement with another retail electric supplier for the establishment of boundaries between territories other than the boundaries established pursuant to this act or providing electric service to electric consuming facilities as between such retail electric suppliers. *Any agreement entered into pursuant to this section shall be subject to approval by the corporation commission. If so approved, the commission shall issue certificates accordingly.*" (Emphasis added.) K.S.A. 66-1,175.

So if the Commission does not approve any such agreement, then the new electric supplier will not have the Commission's certificate to provide electric service to the area. And only the Commission can issue such a certificate. Garden City received no such certificate to provide service. But we must explore the consequences that flow from avoiding this regulatory statute.

This is one of those cases in which the parties dispute the meaning of the word "shall." Garden City persuaded the district court when it argued that "shall" is directory, not mandatory. In other words, in interpreting this law, "shall" means "may." The City also describes the Commission's role in transferring service territories as simply

11

"administrative" or "ministerial." Rather than regulate public utilities, the Commission just takes care of the records.

Wheatland, on the other hand, contends that "shall" is mandatory, meaning that retail electric suppliers have no authority to make these agreements without getting the Commission's approval. We must turn to prior cases for guidance on this question.

For its part, our Supreme Court has explained that "shall" is mandatory in some contexts and directory in others. Because of that, the meaning of the word "is not plain, and construction is required." *State v. Raschke*, 289 Kan. 911, 914-15, 219 P.3d 481 (2009).

But caselaw does provide us some useful points for our analysis. Generally, directory provisions of statutes are seen as those that relate "'to some immaterial matter, as to which compliance with the statute is a matter of convenience rather than substance, or where the directions of a statute are given merely with a view to the proper, orderly, and prompt conduct of business . . . .'" *Raschke*, 289 Kan. at 917 (quoting *Wilcox v. Billings*, 200 Kan. 654, 657, 438 P.2d 108 [1968]). Mandatory provisions of statutes, on the other hand, are often those that require some "'prerequisite conditions'" to exist before certain other powers can be exercised; they are also those provisions that show the Legislature intended "'compliance . . . to be essential to the validity of the act or proceeding . . . .'" 289 Kan. at 917-18.

One way to decide whether a "shall" provision of a statute is merely directory or mandatory is to decide what would happen if you did not comply with that provision. The violation of a directory provision has no consequence. *Raschke*, 289 Kan. at 917. The violation of a mandatory provision "'invalidates purported transactions or subjects the noncomplier to affirmative legal liabilities.'" 289 Kan. at 917.

12

*Raschke* set out four factors to consider when determining whether the Legislature's use of "shall" is mandatory or directory.

(1) Legislative context and history;

(2) substantive effect on a party's rights versus merely form or procedural effect;

(3) the existence or nonexistence of consequences for noncompliance; and

(4) the subject matter of the statutory provision.

289 Kan. at 921.

The first factor—legislative context—is illuminating here. By reading K.S.A. 66-1,175 in the context of the other statutes in the Act, along with other statutes about the Commission, we can answer our question about this "shall" provision of the statute. The Supreme Court took this approach in *State v. Alvarez*, 309 Kan. 203, 208, 432 P.3d 1015 (2019). That approach is appropriate here. When K.S.A. 66-1,175 is read in the context of those other statutes, "shall" is mandatory. That is to say, "shall" means "shall" and not "may" as the district court determined.

We begin with the big picture. The purpose of the Act is to "provide for the division of the state into territories within which retail electric suppliers are to provide the retail electric service as provided in this act." K.S.A. 66-1,171. The law empowers the Commission to divide the state into electric service territories, within which "only one retail electric supplier shall provide retail electric service," and to certify the territory for that exclusive supplier. K.S.A. 66-1,172. To us, the use of the phrase "only one retail electric supplier" is an expression of legislative policy and intent.

The Act also states that a supplier "shall not" extend electric service into the certified territory of another supplier. K.S.A. 66-1,173. While the Act allows suppliers to reach agreements to amend service territories, it says that those agreements "shall be subject to approval" by the Commission, and that the Commission will issue new certificates of service only "[i]f so approved." K.S.A. 66-1,175. In other words, the law

13

contemplates that the Commission may or may not approve an agreement. See K.S.A. 66-1,175. Finally, the Commission may enforce compliance by imposing civil penalties, as it considered doing for Wheatland's and Garden City's violations of the Act. See K.S.A. 66-140.

And if we look at more general statutes, we note that the Legislature gives the Commission "full power, authority and jurisdiction to supervise and control the electric public utilities . . . doing business in Kansas." K.S.A. 66-101. It has been empowered "to do all things necessary and convenient for the exercise of such power, authority and jurisdiction." K.S.A. 66-101. This is a great responsibility, and the Commission must deal with many details such as rates, tariffs, and the national power grid when making its decisions about supplying electricity to Kansans, not just territories outside city limits. It is the Commission's responsibility to make these complex decisions. It is not left to a handshake agreement of two managers.

Given all of that, Garden City's contention that the Commission's role in transferring service areas is merely "administrative" or "ministerial" is unconvincing. The Legislature has given the Commission the authority to determine who the exclusive retail electric supplier is in each service territory. The statute permitting agreements between suppliers explicitly contemplates the Commission denying agreements, since it directs the Commission to issue new service certificates *only* if the Commission approves the agreement. And the Commission has the authority to impose civil penalties for suppliers' failure to comply with the Act. Under these circumstances, Commission approval is not something "immaterial" or something "given merely with a view to the proper, orderly, and prompt conduct of business." *Raschke*, 289 Kan. at 917. Allowing suppliers to make agreements without seeking Commission approval simply undercuts the entire regulatory scheme.

14

We hold that because Wheatland and Garden City did not comply with a mandatory statutory provision, any agreement they made—whether a contract-in-fact or an informal handshake agreement—is invalid because it was never approved by the Commission. That means that Wheatland never transferred its service rights to Garden City—the parties were merely violating the Act. As a result, the ethanol plant and the other three customers remained in Wheatland's exclusive service territory up until Garden City annexed that land. The district court erred when it granted Garden City summary judgment on this point.

*Equity does not nullify the law. Equitable principles do not bar the application of utility regulations found in Kansas statutes.*

Garden City argues—and the district court held—that the equitable doctrines of laches, estoppel, and waiver require us to enforce the oral agreement that allegedly transferred service rights in the disputed area from Wheatland to Garden City. We are not persuaded by this argument.

Laches is meant to bar stale claims and "may apply when a party brings a claim after an unreasonable and unexplained length of time." *In re Marriage of Doud and Modrcin*, 59 Kan. App. 2d 244, 253, 480 P.3d 800 (2020). Equitable estoppel prevents a party from "'maintain[ing] a position inconsistent with one in which he or she accepted a benefit.'" *Thoroughbred Assoc. v. Kansas City Royalty Co.*, 58 Kan. App. 2d 306, 324, 469 P.3d 666 (2020), *rev. denied* 312 Kan. 902 (2020). A party asserting equitable estoppel must show that another party induced it to believe certain facts existed, and that the party asserting the theory relied on those facts to its detriment. 58 Kan. App. 2d at 324. And waiver precludes a party from asserting a right that the party has voluntarily and intentionally given up. *Steckline Communications, Inc. v. Journal Broadcast Group of KS, Inc.*, 305 Kan. 761, 769, 388 P.3d 84 (2017).

15

The district court erred on this point. The court did not appreciate that equitable considerations do not apply when a statutory scheme positively governs the law in a particular situation. *Double M Constr., Inc. v. Kansas Corporation Comm'n*, 288 Kan. 268, 274, 202 P.3d 7 (2009).

A case that we find convincing deals with nullifying some lease-purchase agreements and a school district, *Unified School Dist. No. 207 v. Northland Nat. Bank,* 20 Kan. App. 2d 321, 887 P.2d 1138 (1994). The panel held that the act of entering into the lease-purchase agreements without complying with the Cash-Basis Law was illegal. The resulting agreements were considered void. The court ruled the trial court correctly held that the school districts could not be estopped from claiming and using the legal effect of the contracts found to be void. The *Northland* court held that the equitable principle of estoppel could not prevent the operation of the law. 20 Kan. App. 2d at 332-34.

This principle of statutory preeminence is well established. Early in our state's history, this principle has been manifest.

> "'[Courts] are bound by positive provisions of a statute . . . and, where the transaction or the contract is declared void because not in compliance with express statutory or constitutional provision, a court of equity cannot interpose to give validity to such transaction or contract, or any part thereof.'" *Rambo v. Bank*, 88 Kan. 257, 259, 128 P. 182 (1912) (quoting *Hedges v. Dixon County*, 150 U.S. 182, 192, 14 S. Ct. 71, 37 L. Ed. 1044 [1893]).

The Legislature sculpted the Act to regulate retail electric service in Kansas. That Act's provisions, not equitable principles, govern the transfer of service rights outside city boundaries. And its provision requires the Commission to approve agreements between electric suppliers that alter their service territories. That did not happen here, and Garden City cannot rely on equitable principles to make up for that. The district court erred in finding otherwise.

16

By ruling as it did, the court allowed Garden City to make an end-run around the regulatory statutes that apply to all. Its ruling said the statute requiring approval of the Commission before a territory could be altered or amended was waived. But it was not up to Wheatland to give its territory away. It had no power to do so on its own because it is a regulated public utility. It could only, under the law, seek the Commission's approval to do so. Garden City did not receive this territory either through the handshake agreement between the two managers, nor through the conduct of the parties through the years. Equitable remedies cannot bar the enforcement of this Act.

We are mindful that Garden City could have annexed this territory at any time if it wanted to be the electric supplier to the ethanol plant. But the annexation would lead to compensation to Wheatland according to the Act.

Before we move on, we must address an issue raised by Wheatland. Wheatland cites K.S.A. 66-136, and says it renders any agreement with Garden City void. Under that statute, Commission approval is necessary for a public utility to transfer, assign, or lease its certificate of service; any contract or agreement that has not been approved by the Commission is not "valid or of any force or effect whatsoever."

Garden City objects to Wheatland raising this claim for the first time on appeal. Wheatland asserts that it cited the statute below for the same proposition cited in its brief. The record does not support Wheatland's assertion. Wheatland discussed K.S.A. 66-136 in its complaint to the Commission and that complaint was an exhibit in the district court. But in Wheatland's petition to the district court and three memoranda in support of summary judgment, the company argues that the agreement is void only under the Act, not K.S.A. 66-136. We also note that besides the complaint filed with the Commission, the record citations that Wheatland provided do not refer to K.S.A. 66-136.

17

So we will not address the issue. The Act governs how public utilities supply electricity in most of the state, and it specifically addresses agreements like the one here under K.S.A. 66-1,175. Wheatland brought its petition to the district court under K.S.A. 2017 Supp. 66-1,176(d). And it argued in the district court that it was entitled to compensation under K.S.A. 2017 Supp. 66-1,176(c). It is application of the Act that resolves this dispute.

*Is Wheatland entitled to compensation under K.S.A. 2017 Supp. 66-1,176(c) for the termination of its service rights in the annexed land?*

Actions always have consequences. When Garden City annexed the land around the ethanol plant, there were consequences. K.S.A. 2017 Supp. 66-1,176 governs the termination of service rights in annexed areas. Under subsection (a) of that statute, "[a]ll rights of a retail electric supplier to provide electric service in an area annexed by a city shall terminate 180 days from the date of annexation . . . ." K.S.A. 2017 Supp. 66-1,176(a). Under subsection (c), "[w]henever the service rights of a retail electric supplier are terminated pursuant to subsection (a), fair and reasonable compensation shall be paid to such retail electric supplier by the supplier subsequently authorized to provide electric service." K.S.A. 2017 Supp. 66-1,176(c). The statute sets that compensation at "an amount mutually agreed upon by the affected suppliers" or, if the parties cannot agree, the sum of four components:

> "(1) The depreciated replacement cost for the electric utility facilities in the territory in which the service rights have been terminated pursuant to subsection (a). . . .

> "(2) all reasonable and prudent costs of detaching the electric system facilities to be sold and all reasonable and prudent costs of reintegrating the remaining electric system facilities of the retail electric supplier whose service rights are terminated pursuant to subsection (a);

18

"(3) an amount equal to two times the gross revenues attributable to the customers in the terminated territory during the 12 months next preceding the date of transfer of the service pursuant to subsection (a); and

"(4) an amount equal to the state and federal tax liability created by the taxable income pursuant to the provisions of this paragraph and paragraphs (1), (2) and (3) by the retail electric supplier whose service rights are terminated pursuant to subsection (a) . . . ." K.S.A. 2017 Supp. 66-1,176(c)(1)-(4).

The Legislature amended the statute in 2018 to include a fifth component for determining the sum, but that is not relevant to this dispute. See L. 2018, ch. 6, § 3.

Wheatland contends that the district court erred when it found that Wheatland was entitled to no compensation because it was not serving any customers in the annexed area. The district court found that the statute "presumes at its core that a supplier is to be compensated for the loss of its actual customer roster" and that "[a]ny other approach would be to create an absurd and completely unreasonable result." The court stressed the fact that Wheatland had no customers in that territory:

"155. With regard to annexation, K.S.A. 66-1,176 presumes at its core that a supplier is to be compensated for the loss of its actual customer roster and not that of another. Stated differently, the calculation of loss is to be based upon fact and not fiction. Any other approach would be to create an absurd and completely unreasonable result.

"156. Because Wheatland never had any actual customers in the territory annexed, it is not entitled to any compensation from the City under this statute."

Wheatland also contends that the district court had no textual basis in the law for that presumption and that the statute unambiguously covers compensation for the loss of service rights, not actual customers.

Garden City offers two responses. First, it argues that K.S.A. 2017 Supp. 66-1,176 does not apply. Garden City again contends that Wheatland transferred its service rights based on the oral agreement with Garden City, so its service rights were not terminated by the annexation. We have already ruled to the contrary. Wheatland did not have the power to transfer its service rights without the Commission's approval, which it did not have.

Second, Garden City argues that even if the statute does apply, none of the compensation provisions apply. As we outlined above, subsections (c)(1) and (c)(2) allow compensation for the depreciated replacement cost of electric utility facilities and reasonable costs in detaching existing electric system facilities. See K.S.A. 2017 Supp. 66-1,176(c)(1)-(2). Garden City says those do not apply because Wheatland had no facilities in the area. But Wheatland has never claimed otherwise and has only sought compensation under (c)(3).

That provision—(c)(3)—controls. It allows compensation for an amount equal to two times the gross revenues attributable to customers in the terminated territory during the 12 months after "the date of transfer of the service pursuant to subsection (a)." K.S.A. 2017 Supp. 66-1,176(c)(3).

Garden City argues that this subsection does not apply either because it requires a "transfer of service," but Wheatland had no customers, so there was no transfer. Garden City also cites legislative history purporting to show that the compensation provisions were intended to apply to retail service providers who were serving in the territory at the time of an annexation.

We need not rely on legislative history nor any cannons of construction. The statute is clear. Compensation under this law is for the loss of *service rights*, not loss of customers. Subsection (c) requires compensation "[w]henever the *service rights* of a

20

retail electric supplier are terminated pursuant to subsection (a)." (Emphasis added.) K.S.A. 2017 Supp. 66-1,176(c). And subsection (a) explicitly provides for the termination of service *rights*, not the loss of actual customers: "All rights of a retail electric supplier to provide electric service in an area annexed by a city shall terminate 180 days from the date of annexation . . . ." K.S.A. 2017 Supp. 66-1,176(a). Garden City's argument about the "transfer of service" language of K.S.A. 2017 Supp. 66-1,176(c)(3) does not undercut that. Subsection (c)(3) states "transfer of the service pursuant to subsection (a)," which, again, explicitly provides for the termination of service *rights*.

The Commission granted Wheatland the exclusive rights to serve the territory that contained the ethanol plant. Under K.S.A. 2017 Supp. 66-1,176(a), those rights were terminated 180 days after Garden City annexed the land. The Act calls for fair and reasonable compensation "[*w*]*henever* the service rights of a retail electric supplier are terminated" by annexation. (Emphasis added.) K.S.A. 2017 Supp. 66-1,176(c). Wheatland is therefore entitled to compensation.

The district court did not mince words when it rejected Wheatland's claim for compensation for the loss of service rights. It adopted Garden City's argument that Wheatland's request was "absurd" and "completely unreasonable." Indeed, Garden City has repeatedly called Wheatland's claim "absurd" and characterized the claim as "a perversion of Kansas law." Wheatland's argument is not absurd. The argument follows the law.

Garden City also calls the compensation that Wheatland seeks under the Act as a "fine" or "penalty" to the City and an "unconscionable windfall." It argues that Wheatland should not be entitled to compensation even if this court finds that the City's agreement with Wheatland is void. It cites an intermediate appellate decision from California as

21

authority. See *Shopoff & Cavallo LLP v. Hyon,* 167 Cal. App. 4th 1489, 1523, 85 Cal. Rptr. 3d 268 (2008).

We have two problems with that argument. First, as discussed above, equitable considerations do not apply when the Legislature has enacted statutes that govern the situation. See *Double M Constr., Inc.*, 288 Kan. at 274. And K.S.A. 2017 Supp. 66-1,176 permits compensation for the termination of service rights, and it sets out a formula for calculating the amount of compensation if the parties cannot reach an agreement. That is the law that controls.

But secondly, neither the district court nor Garden City has fairly described the circumstances. Compensation for Wheatland does not amount to a "fine or "penalty" against Garden City for failing to get the Commission's approval, nor is it an unfair windfall for Wheatland. Wheatland had something valuable—the exclusive right to supply electricity to the ethanol plant—a customer that generated several million dollars in annual revenue for its retail electric supplier. It wanted to serve the area, and it had plans to do so, including its purchase of the infrastructure that Garden City had constructed. Garden City deprived it of that right when it annexed the land and named itself the new retail electric supplier. The Act requires "fair and reasonable" compensation for that deprivation. K.S.A. 2017 Supp. 66-1,176(c). Given that, before annexation, Wheatland stood to serve the area for many years to come, an amount two times the gross annual revenue attributable to the customers in the annexed area is not an "unconscionable windfall" for Wheatland.

Garden City chose to annex the territory. The City could have annexed the territory before the ethanol plant was built or any year afterward. In addition, the City could have waited for the Commission to resolve Wheatland's complaint. If the Commission had found in Garden City's favor and transferred service rights to the City, Wheatland would not be entitled to any compensation. But Garden City elected to annex

22

the territory, terminate Wheatland's service rights, and assign itself as the new electric supplier. The Legislature has decided that compensation is owed in that situation.

*The district court should have granted summary judgment to Wheatland. It is entitled to compensation under the Act and the amount of compensation is uncontroverted.*

Our reasoning on this point is straightforward. The district court erred by granting summary judgment to Garden City. Simply put, the court misinterpreted the statute. K.S.A. 66-1,175 does not permit retail electric suppliers to make agreements that alter their service territories without the Commission's approval. Because a statutory scheme governs such agreements, equitable principles do not permit the court to enforce an agreement made without the Commission's approval. As a result, Wheatland never transferred its service rights to Garden City, and it is entitled to compensation under K.S.A. 2017 Supp. 66-1,176(c). That same statute requires compensation "[w]henever the service rights of a retail electric supplier are terminated" by annexation. Wheatland's service rights were terminated by annexation, so it may recover under that statute, even if it had no customers in the annexed area.

Wheatland is entitled to compensation as a matter of law under K.S.A. 2017 Supp. 66-1,176(c), and the amount of compensation is uncontroverted. Wheatland does not contend that K.S.A. 2017 Supp. 66-1,176(c)(1) and (c)(2) apply, since it never had any facilities in the annexed area. But under K.S.A. 2017 Supp. 66-1,176(c)(3), Wheatland is entitled to compensation for "an amount equal to two times the gross revenues attributable to the customers in the terminated territory during the 12 months next preceding the date of" the termination of service rights. Under K.S.A. 2017 Supp. 66-1,176(a), a retail electric supplier's service rights terminate 180 days after annexation.

23

In its response to Wheatland's uncontroverted facts, Garden City provided the following information about its annexations and the revenue generated by the customers in those areas:

- Effective July 11, 2017, Garden City annexed the territory owned by Transportation Partners & Logistics, LLC. Two times the gross revenues attributable to that customer for the 12 months after January 7, 2018—180 days after the annexation—was $12,588.
- Effective August 19, 2017, Garden City annexed territory owned by Windriver Grain, LLC. Two times the gross revenues attributable to that customer for the 12 months after February 15, 2018—180 days after annexation—was $21,934.
- Effective September 21, 2017, Garden City annexed the territory owned by the ethanol plant. Two times the gross revenues attributable to that customer for the 12 months after March 20, 2018—180 days after annexation—was $7,161,504.54.

These total $7,196,026.54. Wheatland accepted Garden City's calculations. As a result, the amount of compensation is uncontroverted.

Wheatland is entitled to compensation under 2017 Supp. K.S.A. 66-1,176(c). The amount of compensation under K.S.A. 2017 Supp. 66-1,176(c)(3) is uncontroverted. For those reasons, the district court erred by not granting summary judgment to Wheatland on its claim for compensation. We therefore remand the case to the district court with directions to enter summary judgment for Wheatland in the amount of $7,196,026.54.

We reverse the district court's grant of summary judgment to Garden City, reverse the denial of summary judgment to Wheatland, and remand the case to the district court with directions to enter summary judgment to Wheatland over Garden City.

24

Reversed and remanded with directions.